```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    6/29/10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

THE HOMELESS PATROL, et al.,                :        **REPORT AND**

                                            :        **RECOMMENDATION**

                        Plaintiffs,         :        **TO THE HONORABLE**

                                                     **GEORGE B. DANIELS**

            -against-                       :

                                                     09 Civ. 3628 (GBD)(FM)
JOSEPH VOLPE FAMILY, et al.,                :

                        Defendants.         :

-----------------------------------------------------------x

**FRANK MAAS,** United States Magistrate Judge.

   Plaintiff Joseph Kastner ("Kastner"), proceeding pro se and in forma

pauperis, brings this action against a host of defendants, including the City of New York

(the "City"), several insurance companies, and others.[1]   In his Second Amended

Complaint ("Amended Complaint" or "Am. Compl."), Kastner seeks relief on a number

of theories, including contractual and tort liability; he also alleges federal statutory

violations.

   Defendants Allstate Insurance Company ("Allstate"), Hereford Insurance

Company ("Hereford"), Continental Casualty Company ("Continental"), Style

_____

  [1]  Kastner brings the action on his own behalf as well as on behalf of the "Homeless
Patrol." Since the Homeless Patrol appears to be Kastner's alter ego and not to have any
independent juridical existence, I refer in this Report and Recommendation only to Kastner.  Cf.
Homeless Patrol v. Town of Thompson, NY, No. 06-4315 (SRC), 2006 WL 2956310, at *1
(D.N.J. Oct. 16, 2006) ("[A]lthough the Complaint is nominally pled as brought by The
Homeless Patrol and The Homeless Patrol Church, the Court will treat Mr. Kastner as the true
plaintiff, because a review of the Complaint reveals that the complained-of conduct alleges harm
against Mr. Kastner.").

Management Co., Inc. ("Style"), Mario Lopez ("Lopez"), Ford Motor Company ("Ford"),

Mystic Leasing Services Co. ("Mystic"), Andrew Rosenberg ("Rosenberg"), Hedi and

Gus Kodoglannis, the City, and William Thompson ("Thompson")[2] (collectively,

"Moving Defendants") have moved to dismiss the Amended Complaint.  (See Docket

Nos. 9, 12, 20, 29, 32, 39, 41, 48).  For the reasons that follow, I recommend that all of

the motions to dismiss be granted, and that the claims against those Moving Defendants

be dismissed with prejudice.  I further recommend that the Court, sua sponte, dismiss:  (a)

with prejudice the federal claims against the non-moving defendants for failure to state a

claim; and (b) without prejudice the state claims against the non-moving defendants for

failure to plead a basis of jurisdiction.

     If the Court adopts these recommendations, the result will be a dismissal of

all of the claims in the Amended Complaint, (Docket No. 24), subject to a limited

opportunity to replead.

I.     Statement of Facts

    A.     Procedural History

     This case originally was filed in the District of New Jersey on July 28,

2005.  (See The Homeless Patrol v. Joseph Volpe Family, No. 05 Civ. 3762 (JAG)

(MCA) (D.N.J.)).  After Kastner filed his first amended complaint in January 2007,

---

     [2]     Thompson is the former City Comptroller.  His name is misspelled as "Thomson" throughout the Amended Complaint.  (See, e.g., Am. Compl. at 17, 47).  I have used the correct spelling in this Report and Recommendation.

defendants Lopez, Ford, Hereford, the City, Style, and Rosenberg moved to dismiss the claims against them.  (Id., Docket Nos. 10, 21, 23, 24, 31).  By order dated January 29, 2009, Judge Joseph A. Greenaway, Jr., granted the City's motion to transfer the case to this Court on the ground that venue in the District of New Jersey was improper and dismissed the defendants' remaining motions as moot.  (Id., Docket No. 33).  Thereafter, on August 12, 2009, Your Honor held a pretrial conference and granted Kastner leave to file the Amended Complaint.  (See Aug. 12, 2009 Tr. (Docket No. 7)).  That same day, Your Honor referred the case to me for general pretrial supervision and to report and recommend with respect to all dispositive motions.  (See Docket Nos. 6, 25).

I subsequently held a pretrial conference on November 5, 2009, during which I directed all defendants who had not previously filed a motion to dismiss but who wished to do so to file their motions by December 4, 2009, with opposition papers to be served by January 4 and reply papers to be served by January 13, 2010.  (Docket No. 37) (Order dated Nov. 5, 2009).  I also extended without date Kastner's time to serve any as-yet unserved defendants named for the first time in the Amended Complaint.  (Id.).

B.    Amended Complaint

Kastner's Amended Complaint is 148 pages long and much of it is rambling and difficult to decipher.  Even after repeated readings, it is unclear how – if at all – the events and allegations in the Amended Complaint relate to one another.  Despite these obstacles, the Court is obliged to construe the facts in the light most favorable to Kastner.

3

Viewed in that manner, the Amended Complaint apparently alleges as follows with respect to the Moving Defendants:

    1.    <u>City Defendants</u>[3]

    Kastner's principal allegation against the City is that it refuses to hire him because it will not hire any individual with a German surname.  (<u>See</u> Am. Compl. at 8, 108, 109, 138).[4]  According to Kastner, this policy is attributable to the role that Germans played in World War II and the fact that Jewish people are leaders of the City.  (<u>Id.</u> at 74, 136).  Kastner notes that he shares his name with Rudolf Kastner, who apparently helped a trainload of 1700 Jews escape from Nazi-controlled Hungary in 1944.  (<u>Id.</u> at 20).

---

[3]    In his Amended Complaint, in addition to the City and Thompson, Kastner has named as defendants the City's Corporation Counsel (misspelled as Council) and eight City agencies:  the Department of Homeless Services, the Department of Transportation, the Taxi and Limousine Commission, the Police Department, the Department of Traffic (presumably the Department of Transportation), the Department of Parks and Recreation, the Department of Environmental Protection, and the Department of Sanitation.  The City notes that, of these, Kastner has served only the City, the Department of Transportation, the Comptroller, and the Office of the Corporation Counsel, but Corporation Counsel has made a special appearance in order to move to dismiss on behalf of the City agencies not previously served.  (City Mem. at 1 n.1).

    City agencies, of course, are generally not suable entities.  <u>See</u> N.Y. City Charter, Chapter 17, § 396 (all actions against City must be brought against City, not against agencies); <u>Dove v. Fordham Univ.</u>, 56 F. Supp. 2d 330, 337 (S.D.N.Y. 1999) ("[O]rganizational subdivisions of the City of New York lack independent legal existence and are not suable entities.").  Moreover, many of Kastner's allegations are applicable to both the City and its agencies.  For this reason, even though I have, at times, described Kastner's allegations against particular agencies, I have treated his claims against the City agencies as claims against the City itself.

    [4]    Citations to the Amended Complaint refer to the numbers in parentheses at the top left of each page because Kastner's paragraphs do not appear to be numbered consecutively throughout that pleading.

Although some of the defendants believe that Kastner's father was a Nazi, he actually was drafted into the United States Army and fought against Germany in World War II. (Id. at 80).

Over the course of twenty years, on hundreds of occasions, the City has refused to hire Kastner or his brother even though they passed the applicable entrance examinations, including a bridge painter's examination. (Id. at 25, 91, 138). Kastner alleges in this regard that "[a] Test is a contract and The City of New York has Liability here; and must pay back pay; since they skipped over Joseph Kastner due to a German Last Name." (Id. at 91). He further explains that the City is "the Major Employer in New York City and has not hired German Based Last Named People and as a Result the Neighborhood known as German Town has no / few Germans anymore." (Id.).

According to Kastner, the City's bias against Germans is further evidenced by the fact that the "City Defendants have named in Manhattan only a few streets after German named people and never has any police around the Germany Embassy at 49th and 1st Ave in Manhattan and or has never to [his] knowledge has/had any employment recruitment programs from Germany to NYC." (Id. at 63) (block capitalization omitted). Also, the City "still believes in euthanasia." (Id. at 91; see also id. at 18, 97).

The Amended Complaint also details the alleged wrongs of numerous City agencies. For example, the Taxi and Limousine Commission ("TLC") "[f]ailed to install restrooms for Taxi Driver[s] at Taxi Stands, [and] removed Taxi Stands and located them

by Taxi Garages where they do the Taxi Driver no benefit at all." (Id. at 18).  The TLC

also repeatedly tried to revoke Kastner's Taxi License.  (Id.).  Moreover, the TLC "forces

Taxi Driver[s] to go to dangerous locations in Drug infested areas and permits passengers

to complain . . . if they are scared to go to the Boro's in Dangerous Locations." (Id. at

48).  Finally, when the credit card machines in the taxis fail and Kastner is forced to work

for free, the TLC's decisions lead to "[r]e-enacted slavery." (Id. at 48, 143).

   The New York City Police Department ("NYPD") "stops anyone for any or

no reason without probable cause, by using an executive order from the Mayor of the City

of New York." (Id. at 19; see also id. at 145).  Indeed, Kastner has been detained and

mistreated repeatedly by the NYPD.  The NYPD also has "defame[d] . . . Kastner with 2

counts of Disorderly Conduct, 1 Count of a Class E Felony, 3 Counts of False Arrest,

[and] 10 Counts of Detaining and Stopping Plaintiffs[.]" (Am. Compl. 49, 108, 109).

The City (presumably the NYPD) also failed to dust Kastner's apartment for fingerprints

after it was robbed; instead, it arrested Kastner for insurance fraud.  (Id. at 60).

   The Department of Transportation ("DOT") "has failed in it[]s fiduciary

duties to regulate and manage Traffic." (Id. at 25).  It has done so by putting "flower

pots" and "refu[s]e islands" in the middle of thoroughfares, which, in turn, has caused

additional traffic accidents.  (Id. at 25-26).  Kastner seeks a mandatory injunction

requiring the DOT to return the City streets to their prior condition.  (Id. at 26).

The City and its agencies also have thwarted Kastner's efforts to aid the homeless.  Thus, the "New York City [Department of] Parks and Recreation impound[ed] and destroy[ed] 3 Homeless Donation Boxes used by the Homeless Patrol for Clothing and Canned Food."  That agency also told Kastner he needed "a permit but failed to provide [him] with a donation box permit application and or any other mean to make donation boxes appear in New York City to help feed and cloth[e] the Homeless."  (Id. at 27).  The City further has prevented him from registering the Homeless Patrol as a Section 501(c)(3) nonprofit organization by requiring him to have six board members.  (Id. at 18, 141).  Additionally, the City and the Department of Homeless Services mistreat the homeless by arresting them when they sleep on the streets and by providing them with no food or money.  (Id. at 60, 100).  The City gets money from New York State, however, and then "indirectly rips off our federal government for millions and billions of dollars and lines the pockets of [the City]."  (Id. at 60, 142).

"The Department of Environmental Protection does not protect at all."  (Id. at 27).  Rather, it is "poisoning [the City's] food [and water] supply" and failing to protect residents from toxic dumping.  (Id.).  In addition, the City (and Thompson) dump raw sewage into the East River and the Atlantic Ocean.  (Id. at 50, 109).  The Department of Sanitation similarly "[h]as let Garbage Stockpile all over the City to sometimes 2nd Story Levels."  That agency also refuses to purchase narrower garbage trucks, resulting in Kastner, as a taxi driver, being forced to wait in traffic behind trucks.  (Id. at 27).

7

Finally, Thompson has hoarded all of the money intended to aid the homeless.  (Id. at 18).  He also has wasted millions building the Highline Park in a time of economic recession.  (Id. at 60).

In his Amended Complaint, Kastner seeks to recover a total of $550 million from the City.  (Id. at 104).

### 2.   Allstate

Allstate issued Kastner a renter's insurance policy, but refused to pay him $8,000 after his apartment was burglarized; instead, Allstate called the NYPD and caused Kastner to be charged with insurance fraud.  (See id. at 8-11, 19, 45, 60-61, 91-92, 98, 110).  More specifically, Allstate "Arrest[ed] [Kastner] Falsely and brand[ed] him with a Class E Felony which result[ed] in . . . a life long luster of dead end Slave Jobs."  (Id. at 8).  The burglary and the arrest both apparently occurred in or around 1986.  (See id. at 110) ("[T]he apartment robbery occurred on or about 1986.").  Kastner seeks to recover $500 million in damages from Allstate as compensation for these incidents.  (Id. at 106).

### 3.   Hereford

Hereford denied Kastner's workers' compensation claim after he was the victim of an on-the-job assault in 2001.  As he explains:

> After . . . Kastner was robbed and was seriously injur[]ed on
> Halloween 2001 in a taxicab N.Y. 4FI7, had a N.Y. State
> worker's compensation case, at the behest of Hereford . . .
> through the joint / separate effort's of Mr. Marcus Francis of
> Hereford Insurance Co. and Babara Trottier of Continental
> . . . based their whole case of workers compensation

> insurance company fraud against . . . Kastner . . . . In
> December of 2003 Mr. Marcus Francis consulted with the
> New York State insurance fraud office of Mr. Mark Howard
> and attempted without success to arrest . . . Kastner . . . . As a
> result Hereford Insurance has bre[a]ched a contractual
> Agreement with: "Mario Lopez the owner of the taxicab that
> Joseph Kastner was driving when he got robbed on Oct 31,
> 2001;" Hereford than tried to have . . . Kastner arrested
> through conspiracy with Mario Lopez, Hedi and Gus of
> Mystic Leasing Mario Lopez's representatives.  [Kastner]
> tried to settle with Hereford for **$35,000** of sick and recovery
> pay for 6 months of lying at home: recovering with no avail[.]
> Hereford[ ] would rather fight in federal court!

(Id. at 62) (block capitalization omitted).  Hereford also "tried to indict and Arrest

[Kastner] in New York State Workers Compensation Court and failed."  (Id. at 11).

During these proceedings, Hereford engaged in witness tampering by threatening doctors

who were to testify on Kastner's behalf in his workers' compensation case.  (Id. at 11).

Additionally, Hereford conspired with other defendants to have Kastner permanently

jailed in relation to an insurance fraud and to help other defendants avoid paying higher

insurance rates.  (Id. at 14, 47-48).  Finally, Hereford refused to pay Kastner when he

suffered injuries attributable to the defective seats and defective air intake valve in the

Ford taxis he drove.  (Id. at 32-33).  As a consequence, Kastner seeks to recover a total of

$300 million from Hereford.  (Id. at 104).

4.   <u>Continental</u>

Kastner purchased a life and accident insurance policy from Continental, which provided coverage for him and his wife from 2000 to 2003.  (<u>Id.</u> at 8).[5]  Thereafter, Continental breached its insurance contract with Kastner by not paying him $250,000 that he was owed under the policy after he was injured during the robbery in his taxicab in 2001.  (<u>Id.</u> at 9).  Through its mailings and false advertisements, however, Continental had promised to pay Kastner or his wife "in the event of an accident and or accidental armed robbery."  (<u>Id.</u> at 10).  Continental also sold Kastner's policy to Hartford, but failed to notify him of the change.  (<u>Id.</u> at 62).  Like Hereford, Continental further attempted to "indict and Arrest [Kastner] in New York State Workers Compensation Court," but failed.  (<u>Id.</u> at 10).  Finally, like Hereford, Continental wrongfully refused to pay Kastner for the injuries he received as a consequence of driving Ford taxis with defective seats and defective air intake valves.  (<u>Id.</u> at 32-33).

5.   <u>Style and Andrew Rosenberg</u>

Style is Kastner's former employer.  (<u>Id.</u> at 12).  According to the New York State Department of State, Rosenberg is Style's Chairman or CEO. (<u>See</u> NYS Department of State Corporation and Business Entity Database, http://appext9.dos.state.ny.us/corp_public/corpsearch.entity_search_entry (last visited June 21, 2010)). Rosenberg is listed on the Court's docket sheet as a defendant but is not named in the

---

[5]      Kastner sued Continental as "C.N.A.," but refers to both Continental and C.N.A. in his Amended Complaint.  To avoid confusion, I will refer only to "Continental."

caption of the Amended Complaint.  It therefore is unclear whether Kastner intended to

sue Rosenberg individually.  In any event, because the Amended Complaint often does

not distinguish between Rosenberg and Style, I have assumed, for purposes of this Report

and Recommendation, that Rosenberg is a defendant.

According to Kastner, "Style Management intentionally leased [him]

Fraudulent Taxicabs with Forged Rate Cards and must return over $250,000 in lease

payments In over 4 1/2 years of Taxi Rentals and Leases." (Id. at 12).  Style also owes

Kastner $600 in up-front weekly payments and a $100 deposit.  (Id. at 65).

In addition, Style provided a "decrepit, deplorable work environment" both

in its taxi garage and in its taxis.  (Id. at 12).  Indeed, Style tampered with the pollution

controls on its taxis and created a hazardous working environment within the cabs.  (Id. at

64).

Rosenberg hated Kastner due to his German last name:

> For over four [and] a half long years [Kastner] watched . . .
> Rosenberg Operate. He calls the racial epitaphs' over the
> Public Address System, constantly degrades Plaintiff Joseph
> Kastner, Sends Joseph Kastner home over 45 times with no
> Compensation, Hates Joseph Kastner because he is German
> American; hates and has charged Joseph Kastner a one time
> $100.00 late fee for Taxi Inspection; Charges Joseph Kastner
> over $40.00 per shift to get out early. Sent Joseph Kastner to
> do hundreds of errands without pay; failed to provide rest
> rooms for Joseph Kastner; had rats, roaches and vermin living
> in the air conditioning I heating system in the Taxi's and or
> inside the Taxi's; and in his garages; never provided one chair
> for Joseph Kastner to sit in. Made Joseph Kastner wait
> sometimes 1 to 5 hours for a Taxicab; Failed to get Stand By

11

> Vehicles' so that if a Taxicab breaks down the Taxi driver can
> work in another Taxicab.

(Id. at 12).

As a result of Rosenberg's hatred for him, Kastner was treated worse than the other Style employees.  Specifically, Style gave new taxi cabs to everyone but Kastner, who received taxis unfit for the roadways because he had a German last name. (Id. at 45, 65).  Rosenberg also called the NYPD, reported that Kastner never had worked at Style, and tried to have Kastner arrested for trespass.  (Id. at 12, 65).  Style further refused to file a second workers' compensation claim for Kastner and then sought to have his taxi license taken away without due process.  (Id. at 13).

Additionally, Style refused to pay Kastner for injuries received as a result of driving its defective cabs or failure to repair the cabs with available after-market solutions.  (Id. at 31-32).  Style and Rosenberg also dumped toxic chemicals into the City's water supply.  (Id. at 27, 50).

Kastner seeks to recover $300 million from Style (and presumably Rosenberg).  (Id. at 104).

### 6.    Lopez, Mystic, and Hedi and Gus Kodoglannis

Lopez owned the medallion for the taxi that Kastner was driving when he was beaten and robbed in 2001.  (Id. at 62).  At that time, Kastner apparently worked for Mystic, which is partially owned by Hedi Kodoglannis.  (Id. at 131; Style Mem. at 2). Together with the other defendants, Mystic, Lopez, and Hedi and Gus Kodoglannis

attempted to have Kastner arrested for insurance fraud at a workers' compensation hearing.  (Am. Compl. at 14, 46).  They also brought an action against Kastner's wife in small claims court.  (Id. at 46).

Mystic and Lopez were involved in the other conspiracies to deny Kastner compensation for his various injuries and claims.  (Id. at 31-33).  Additionally, as Kastner somewhat cryptically explains, Lopez "has a liability to help [him but] has chosen not to help and now . . . is being sued for inaction; which in itself is an action and other charges following inactions."  (Id. at 39).

Hedi Kodoglannis worked for Mystic and saw Kastner immediately after he was robbed.  (Id. at 46).  She was angry because she had to pay $175 for a tow truck. (Id.).

7.    Ford

Ford "makes Ford Taxicabs Defective on Purpose to save money; which forces the Consumer and or Taxi Driver to crawl to their dealership and repair the Taxicab, Lincoln Town Car Limousines and or Cars . . . . This generates revenue for parts and service and or New Taxi Sales."  (Id. at 13; see also id. at 46, 72).  Kastner has been injured by Ford's defective designs, which have caused him to have "Asthma, Breathing Disorder[s], [and] Lower and Upper Back Disk Problems."  (Id. at 13).  Ford also failed to install in its vehicle alarm or security systems which would have prevented Kastner's robbery and subsequent injury in a Ford vehicle in 2001.  (Id.).  Ford further has failed to

13

pay Kastner for the injuries caused by the defective seats and air intake systems in its

taxicabs.  (Id. at 31-32).[6]

C.      Defendants' Motions

Seven defendants (or groups of defendants) have moved to dismiss the

Amended Complaint.  Several of these motions were filed before the service of that

pleading, but the parties were instructed at the initial conference before me that any

motions addressed to earlier pleadings would be deemed applicable to the Amended

Complaint.  (See Nov. 5, 2009 Tr. at 9).

D.      Opposition Papers

Perhaps not surprisingly given the length of the Amended Complaint,

Kastner's papers in opposition to the Moving Defendants' motions to dismiss are prolix.

(See Docket Nos. 21, 22, 35, 53, 57).  Indeed, all but one of Kastner's submissions violate

my published Individual Practices, which contain a twenty-five page limit.  In several

instances, Kastner's opposition papers exceed one hundred pages in length.  Those papers

consist primarily of text copied and pasted from his Amended Complaint, as well as

copies of various judicial decisions and the entire text of the United States Constitution.

In January 2010, Kastner supplemented these submissions with a binder

more than 400 pages long captioned "Courtesy Copy of the Mainframe 2008."  At a prior

conference, Kastner explained that the "Mainframe" is a word processing file on his

---

[6]      Kastner alleges that he also cannot find an attorney to represent him because Ford
employs fifty percent of the law firms in the country.  (Id. at 72).

computer that contains a "renumbered version" of "all the opposition papers that [he]

submitted in New Jersey."  (Nov. 5, 2009 Tr. at 9).  Kastner submitted this document

even though I previously had declined his offer to submit it to me on CD-ROM.  (Id. at

10).  Inasmuch as Kastner's Amended Complaint is almost 150 pages long, and he has

submitted several hundred pages of opposition papers, I have not considered the contents

of the "Mainframe," which appear to be both duplicative and untimely.

   In a similar fashion, Kastner has submitted surreply papers in further

opposition to the Allstate, Hereford, Style, Continental, and City motions, despite my

directive that he not do so.  (See Docket Nos. 38, 52, 54, 60; see also Docket No. 37

(Order dated Nov. 5, 2009)).  Several defendants have asked the Court to strike these

papers.  Kastner was not granted leave to file any surreplies.  Accordingly, I have not

considered their contents.

## II. Standard of Review

### A. Rule 8(a)

   Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to

contain "a short and plain statement of the claim showing that the pleader is entitled to

relief."  Fed. R. Civ. P. 8(a)(2).  As the Second Circuit has explained, the

> statement should be plain because the principal function of
> pleadings under the Federal Rules is to give the adverse party
> fair notice of the claim asserted so as to enable him to answer
> and prepare for trial . . . .  The statement should be short
> because "unnecessary prolixity in a pleading places an
> unjustified burden on the court and the party who must

> respond to it because they are forced to select the relevant
> material from a mass of verbiage."

Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (quoting 5 Charles Allen Wright &

Arthur R. Miller, Federal Practice and Procedure § 1281, at 365 (1969)) (brackets

omitted).  "When a complaint violates Rule 8(a), the court may, sua sponte or on

defendant's motion, strike repetitive or irrelevant portions or dismiss the complaint."

Sleigh v. Charlex, Inc., No. 03 Civ. 1369 (MBM), 2004 WL 2126742, at *8 (S.D.N.Y.

Sept. 14, 2004).  As Judge Mukasey noted in Sleigh, "[d]ismissal is usually warranted

only in cases where 'the complaint is so confused, ambiguous, vague, or otherwise

unintelligible that its true substance, if any, is well disguised.'"  Id. (quoting Salahuddin,

861 F.2d at 42).

One option in this case therefore would be to recommend that the Amended

Complaint be dismissed without prejudice so that Kastner could redraft it.  The Amended

Complaint, however, is at least the third pleading that Kastner has filed in this action.

Granting him leave to amend at this late date also might lead to another round of briefing

in a case that has dragged on since 2005 and in which the Moving Defendants have

already had to expend substantial funds.  Accordingly, despite its length, I will address

the merits of the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil

Procedure rather than resorting to Rule 8(a).

16

B.    Rule 12(b)(6)

Under Rule 12(b)(6), a court must dismiss a complaint that fails to state a

claim upon which relief can be granted.  In deciding a motion under Rule 12(b)(6), the

Court must accept as true all factual allegations made in the complaint and draw all

reasonable inferences in favor of the plaintiff.  Leatherman v. Tarrant County Narcotics

Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Newman & Schwartz v.

Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir. 1996).   "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct.

1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

While this does not require detailed factual allegations, it does require "more than an

unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertion[s]

devoid of further "factual enhancement."  Id.   Determining whether the allegations of a

complaint nudge a plaintiff's claims across the line from "conceivable to plausible"

requires a court to "draw on its judicial experience and common sense."  Iqbal, 129 S. Ct.

at 1950-51.  Moreover,  the Court is "not bound to accept as true" legal conclusions

couched as factual allegations.  Twombly, 550 U.S. at 555.

In this action, Kastner is proceeding pro se.  Accordingly, the Court is

obligated to "read his supporting papers liberally, and . . . interpret them to raise the

strongest arguments that they suggest."  Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.

1994).  The Court also may rely on his opposition papers in assessing the legal sufficiency of the claims in his Amended Complaint.  See Crum v. Dodrill, 562 F. Supp. 2d 366, 373 n.13 (N.D.N.Y. 2008) (citing Gadson v. Goord, No. 96 Civ. 7544 (SS), 1997 WL 714878, at *1, n.2 (S.D.N.Y. Nov. 17, 1997)).

  C. Section 1915

    Kastner commenced this action without the payment of any filing fees.  He therefore is subject to 28 U.S.C. § 1915(e)(2) ("Section 1915"), which requires the Court to dismiss his case "at any time if the court determines that . . . the action or appeal . . . is frivolous or malicious . . . [or] fails to state a claim on which relief may be granted."

III. Discussion

  A. Time-Barred Claims

    For the most part, the Amended Complaint does not specify the dates when the various wrongs alleged by Kastner occurred.  There are, however, a few exceptions.

    First, Kastner seeks to assert claims against Allstate and the City based on his alleged prosecution for insurance fraud following a burglary of his apartment in 1986.  (See Am. Compl. at 92, 98, 110-11.)  Under New York law, if Kastner was prosecuted for fraud, the prosecution would have had to have been commenced within five years of the commission of his crime.  This presumably means that both Allstate's instigation of a criminal investigation and the filing of charges against Kastner would have had to have occurred no later than the early 1990s.

In an effort to argue that his claims arising out of the burglary are nevertheless timely, Kastner asserts, without the recitation of any authority, that "there is no statute of limitations on defamation of character [ ] with a false criminal history."  (See Kastner's Opp'n to Allstate (Docket No. 57) ("Allstate Opp'n"), at 5) (block capitalization omitted).  A defamation claim, however, clearly is subject to a one-year statute of limitations in New York.  See N.Y. C.P.L.R. § 215(3).  Indeed, any claim Kastner conceivably might seek to bring as a result of the 1986 burglary is time-barred.  See, e.g., N.Y. C.P.L.R. §§ 213 (six-year limitations period for actions based on fraud, contract, or theories of liability for which no limitations period is prescribed); 214(5) (three-year period for actions alleging personal injury); 215(3) (one-year period for actions based on intentional torts).  Accordingly, Kastner's claims against the City and Allstate based on the 1986 robbery (which include all of his claims against Allstate) must be dismissed on statute of limitations grounds.

Kastner also contends that he was the victim of a robbery while driving a taxi on October 31, 2001, and subsequently was terminated by Mystic, for which he then was a driver, in the spring of 2002.  (See Am. Compl. at 62, 129-31).  Since the statute of limitations for actions alleging personal injury is three years under N.Y. C.P.L.R. § 214(5), and this lawsuit was not commenced until July 2005, any claims arising out of personal injuries that Kastner sustained during the robbery are time-barred.  This bar also extends to any claims against any defendants arising out of the injuries that Kastner

allegedly sustained while driving defective taxis during the period he was employed by

Mystic.  Finally, the bar would extend to any product liability claim regarding the taxi that

Kastner was driving when he was robbed, as that claim also would be subject to the three-

year personal injury statute of limitations.  See, e.g., Blanco v. Am. Tel. & Tel. Co., 90

N.Y.2d 757, 767 (1997) (applying N.Y. C.P.L.R. § 214 to product defect claim).

B.    Constitutional Standing

Kastner also lacks standing to pursue many of his claims.  As the Supreme

Court has explained,

> the irreducible constitutional minimum of standing contains
> three elements.  First, the plaintiff must have suffered an
> injury in fact – an invasion of a legally protected interest
> which is (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical.  Second, there must
> be a causal connection between the injury and the conduct
> complained of – the injury has to be fairly traceable to the
> challenged action of the defendant, and not the result of the
> independent action of some third party not before the court.
> Third, it must be likely, as opposed to merely speculative, that
> the injury will be redressed by a favorable decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations, internal quotation

marks, ellipses, and brackets omitted).  The burden is on a plaintiff to establish these

elements of constitutional standing, which are to be "evaluated at the time the complaint

is filed."  Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo., 458 F. Supp. 2d 160,

167 (S.D.N.Y. 2006); see also Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel &

Tower, No. 01 Civ. 5518 (MBM), 2003 WL 1751785, at *7 (S.D.N.Y. Apr. 2, 2003)

("Events occurring after the lawsuit has been filed may be relevant to whether the claim has become moot but are not relevant to whether a plaintiff has standing in the first instance.").

In considering "whether the alleged injury is concrete and particularized," courts must "assess whether the injury affect[s] the plaintiff in a personal and individual way, to confirm that the plaintiff has a personal stake in the controversy and avoid having the federal courts serve as merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding." Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003) (citation and quotation marks omitted); see also Knowles v. U.S. Coast Guard, 924 F. Supp. 593, 599 (S.D.N.Y. 1996) ("[C]ourts generally should refrain from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances[.]'") (citations omitted).

In this case, Kastner has alleged many injuries that are neither particularized nor personal to him, but, rather, constitute general grievances. For example, Kastner makes numerous allegations related to toxic dumping by the City and the City's failure to clean up the streets, but has not established that he suffered a concrete injury as a result. Similarly, because Kastner has a residence in New Jersey and has not alleged that he is homeless, he lacks standing to challenge the City's treatment of homeless persons.

Accordingly, in the remainder of this Report and Recommendation, I have addressed Kastner's claims only to the extent he alleges harm to himself individually, as opposed to the general population of the City.

C.      Constitutional Violations

At various points, Kastner implies that he is bringing claims against all forty-one named defendants under the Constitution.  (See, e.g., Am. Compl. at 43) (referring to "Constitutional violations," "Civil Rights Violations," and "Unconstitutional actions").   Since constitutional claims can only be brought against governmental actors, the City is the only defendant against whom Kastner may bring a constitutional claim. See, e.g., Rendell-Baker v. Kohn, 457 U.S. 830, 837 (1982) ("Fourteenth Amendment, which prohibits the states from denying federal constitutional rights . . . , applies to acts of the states, not to acts of private persons or entities."); Friend v. Union Dime Sav. Bank, No. 79 Civ. 5450 (KTD), 1980 WL 227, at *2 (S.D.N.Y. Aug. 18, 1980) ("[T]he First, Fifth and Fourteenth Amendments require governmental action.").

The vehicle pursuant to which Kastner may bring a constitutional claim against the City is 42 U.S.C. § 1983.  To state a Section 1983 claim, a plaintiff must show that a person acting under color of state law has deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983; Parath v. Taylor, 451 U.S. 527, 535 (1981), overruled in part on other grounds by Daniels v. Williams, 474 U.S. 327, 330-31 (1986).  Additionally, because the City cannot be held

liable on a respondeat superior theory, to the extent Kastner seeks to recover against the City for the acts of its officers or employees, he must show that the constitutional violation of which he complains resulted from a practice or policy of the City.[7] <u>Monell v. Dep't of Soc. Servs. of N.Y.</u>, 436 U.S. 658, 690 (1978).

Liberally construed, the only potentially viable constitutional allegation in Kastner's Amended Complaint is that he was falsely arrested.  The elements of a false arrest claim under state and federal law are the same.  <u>See</u> <u>Shain v. Ellison</u>, 273 F.3d 56, 67 (2d Cir. 2001).  Accordingly, Kastner must plead that the defendants "intended to confine him, he was conscious of the confinement, he did not consent to the confinement, and the confinement was not otherwise privileged."  <u>Id.</u>

Assuming that Kastner has adequately pleaded the first three elements, he still must show that the arrests were not privileged.  An arrest is privileged when it is made with probable cause.  <u>See</u> <u>Singer v. Fulton County Sheriff</u>, 63 F.3d 110, 118 (2d Cir. 1995).  Probable cause obviously exists if an arresting officer acts pursuant to a valid warrant.  <u>Artis v. Liotard</u>, 934 F. Supp. 101, 103 (S.D.N.Y. 1996).  Probable cause also exists when the arresting officer lacks a warrant, but "has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  <u>Singer</u>, 63 F.3d at 119

---

[7]     Kastner names Thompson individually, but his only allegations against Thompson in that capacity are that Thompson dumped toxic waste into City waters and that he embezzled money intended for the homeless.  As noted above, Kastner does not have standing to complain about either of these alleged wrongs.

(internal quotation marks omitted).   In determining whether probable cause exists, the

Court must "look to the 'totality of the circumstances,'"  Caldarola v. Calabrese, 298 F.3d

156, 162 (2d Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 233 (1983)), to

determine the information "available to the officer at the time of the arrest and

immediately before it," id. (internal quotation marks omitted).

     In the Amended Complaint, Kastner alleges he has been "unjustly" arrested

multiple times.  Thus, he alleges that the NYPD:

> (1) Arrests Joseph Kastner for Driving a Car. (2) Fails to ask
> Joseph Kastner why his friends at the Dinner did not pay the
> Check. (3) Joseph Kastner states that he gave his friends his
> end of the din[n]er at the Rainbow Coffee Shop in the Bronx
> and they choose not to pay. They asked me to get the car
> which was parked a block away. I did not know that they were
> not going to pay. (4) The NYPD charged Plaintiff Joseph
> Kastner a Charge for disorderly conduct unjustly. (5) The
> Plaintiffs apartment gets robbed, The Plaintiffs apartment
> renters insurance Allstate: complains to The NYPD Arrested
> who me Unjustly because my apartment got robbed through
> Co-Hort Allstate. And [ ]has made friends within the
> precincts like detective Kenny at the 20th Precinct; "who
> arrested me and gave me a reckless driving ticket because my
> wheels spun on a piece of metal plated construction, Spat at
> my Face, Impounded my Taxi, Took away my Taxi license
> through an Unjust LD6 Proceeding for an unsafe start[.]" . . .
> (6) The NYPD stopped me [and] detained me at on or about
> 50 occasions[.]

(Am. Compl. at 19; see also id. at 64).  Elsewhere in the Amended Complaint, Kastner

alleges that the NYPD has falsely arrested him three times, (id. at 49), later explaining

that the "City Defendants"

> (1) Falsely arrest[ed] me as follows: Defaming my character with a Class E Felony with their co-hort Defendant #3 Allstate. (2) Defaming my Character 2 times 1 arrest in the Bronx because I was driving my friend[']s car. I got arrested for disorderly Conduct. (3) Defaming my Character 2 times [I was] in . . . Manhattan because I was driving a Style Management Taxi with a forged rate card, Etc ... I got arrest[ed] for disorderly Conduct, lost my Hack Taxi License for about 10 days.

(Id. at 145).

Kastner has not pleaded a prima facie claim of false arrest with respect to any of these incidents.  At the outset, his conclusory statements suggesting that he was falsely arrested are insufficient, as a matter of law, to make out a false arrest claim.  See Twombly, 550 U.S. at 555.  He also has failed to plead facts establishing a lack of probable cause for any of his arrests and therefore has not satisfied the lack of privilege element.[8]  Indeed, in connection with several incidents – including the ones involving driving with a forged rate card and failing to pay a restaurant check – he alleges facts that seem to establish probable cause to arrest him.  In all but one instance, he also has failed to provide even the year in which the incidents allegedly took place.  Even his most detailed description of an incident – that he was driving a friend's car in the Bronx and

---

[8]      On page 19 of the Amended Complaint, Kastner states generally that the NYPD "stops anyone for any or no reason without probable cause."  This is insufficient to allege that there was no probable cause for his arrests.  Indeed, the NYPD does not need probable cause to stop someone.  See, e.g., Terry v. Ohio, 392 U.S. 1, 22-24 (1968) (only reasonable suspicion is required), Alabama v. White, 496 U.S. 325, 328-32 (1990) (corroborated anonymous tip sufficient to justify stop).

was arrested[9] – lacks the sort of factual detail that might nudge his claim that he was arrested without probable cause across the line from "conceivable" to "plausible."[10]  See Iqbal, 129 S. Ct. at 1950-51.

D.    Employment Discrimination

Kastner alleges that the City has discriminated against him by refusing to hire him because of his German surname and because of his age.  Additionally, he alleges that Style subjected him to a hostile work environment because of his German heritage.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"), provides that it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate

---

[9]    From Kastner's papers, it appears that this is the same incident that involved not paying a restaurant check.  (See Allstate Opp'n at 33.)  If so, the incident took place in 1982, and, thus, is also barred by the three-year statute of limitations applicable to Section 1983 actions in New York State. See, e.g., Cloverleaf Realty of N.Y., Inc. v. Town of Wawayanda, 572 F.3d 93, 94 (2d Cir. 2009) (citing Owens v. Okure, 488 U.S. 235, 251 (1989); Jaghory v. NY. State Dep't of Educ., 131 F.3d 326, 331 (2d Cir. 1997)).

[10]    Kastner also has not pleaded a prima facie case for malicious prosecution, as he has not alleged that any prosecution against him ended in a favorable termination.  See Posr v. Court Officer Shield No. 207, 180 F.3d 409, 417 (2d Cir. 1999) (listing favorable termination as an element of malicious prosecution under New York law); see also Rohman v. N.Y. City Transit Auth. (NYCTA), 215 F.3d 208, 215 (2d Cir. 2000) (using New York law to consider claim of malicious prosecution under Section 1983).

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).

Kastner's Amended Complaint can also be construed to assert claims under the New York State and New York City Human Rights Laws ("NYSHRL" and "NYCHRL"), which similarly prohibit discrimination in employment on the bases of national origin or age, see N.Y. Exec. Law § 290 et seq.; NYC Admin. Code § 8-107, and under 42 U.S.C. § 1981 ("Section 1981"), which prohibits discrimination on the basis of ethnicity.[11]  The same allocation of evidentiary burdens applies to claims of employment discrimination under the NYSHRL, the NYCHRL, and Section 1981 as to claims under Title VII and the ADEA.  See Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) (applying Title VII analysis to state and municipal claims in New York); Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 838-39 (2d Cir. 1996) (applying Title VII analysis to Section 1981 claim); Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 484 (S.D.N.Y. 1999) (noting that claims under Title VII, the NYSHRL, and the NYCHRL "can be examined identically for summary judgment purposes"); Rosenblatt v. Bivona & Cohen, P.C., 946 F. Supp. 298, 300 (S.D.N.Y. 1996) (NYSHRL "is applied in a fashion consistent with the federal civil rights laws.").

---

[11]     It is not clear that Kastner's claim based on his German last name could be considered a claim based on ethnicity, but Section 1981 does not cover claims based on national origin.  See Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998).

Accordingly, to establish a prima facie case of employment discrimination under any of these statutes, Kastner must show that (1) he was a member of a class protected by the statute; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination.  See Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)) (Title VII); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001) (ADEA).  A complaint "need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, 'the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim.'"  Barbosa v. Continuum Health Partners, Inc., __ F. Supp. 2d __, 2010 WL 768888, at *3 (S.D.N.Y. Mar. 8, 2010) (quoting Fowler v. Scores Holding Co., 677 F. Supp. 2d 673, 679 (S.D.N.Y. 2009).[12]

Additionally, before a federal suit can be filed under Title VII or the ADEA, an administrative charge must be filed with the Equal Employment Opportunity

_____

[12]     Recently, the City Council has enacted legislation requiring claims under the NYCHRL to be reviewed more liberally than claims under its state and federal counterparts. "The New York City Restoration Act, which amended the NYCHRL, 'notified courts that (a) they had to be aware that some provisions of the [NYCHRL] were textually distinct from its state and federal counterparts, [and] (b) all provisions of the [NYCHRL] required independent construction to accomplish the law's uniquely broad purposes.'"  Fowler, 677 F. Supp. 2d at 682 (quoting Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009)) (emphasis in original); see also Panzarino v. Deloitte & Touche, LLP, No. 05 Civ. 8502 (BSJ) (RLE), 2009 WL 3539685, at *9-10 (S.D.N.Y. Oct. 29, 2009) (construing plaintiff's NYCHRL sex discrimination  claim as requiring an independent and liberal construction).

Commission ("EEOC").  See 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d); see also

Fitzgerald v. Henderson, 251 F.3d 345, 358-59 (2d Cir. 2001) (Title VII); Francis v.

Elmsford Sch. Dist., 442 F.3d 123, 126 (2d Cir. 2006) (ADEA).  In states such as New

York, which have a fair employment practice law, an employee's complaint must first be

filed with the state agency empowered to act against unlawful employment practices.  See

42 U.S.C. § 2000e-5(c); 29 U.S.C. § 633(b).  The subject matter jurisdiction of the EEOC

to investigate a claim and issue a notice of right to sue vests only after the aggrieved party

has filed with the state agency and given that agency a chance to resolve the dispute.  See

id.  Because exhaustion of administrative remedies is an "essential element" of the Title

VII and ADEA statutory schemes, it is a precondition to any federal suit.  See Legnani v.

Alitalia Linee Aerree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001).

    1.    City

        In the absence of any allegation that Kastner has filed an administrative

charge with either the New York State agency or the EEOC, his Title VII and ADEA

claims against the City must be dismissed for failure to exhaust administrative remedies.

        Turning to his potential claims against the City under Section 1981, the

NYSHRL, and the NYCHRL, Kastner has adequately alleged that he is within a protected

class (because of his German last name and because he is over the age of forty) and that

he suffered an adverse employment action (because he was not hired).  He has not,

however, alleged factual material sufficient to provide fair notice to the defendants or

29

make his claim facially plausible.  Indeed, the only City job Kastner has identified is a

"Bridge Painter" job for which both he and his brother apparently applied.[13]  Although he

failed to set forth in his Amended Complaint the year he applied for this job, Kastner

conceded during the conference before me that he and his brother "took the test almost 20

years ago."  (Nov. 5, 2009 Tr. at 10).   Thus, this claim clearly is barred by the three-year

statute of limitations applicable to discriminatory hiring claims under the NYCHRL, the

NYSHRL, and Section 1981.  See N.Y. C.P.L.R. § 214(2); N.Y. City Admin. Code §

8-502(d); Mahmud v. Kaufmann, 496 F. Supp. 2d 266, 270-72 (S.D.N.Y. 2007) (claims

for discriminatory hiring under Section 1981 borrow state statute of limitations for

personal injury, which is three years in New York); see also Van Zant v. KLM Royal

Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (three-year statute of limitations applies

to claims under the NYSHRL); Whaley v. City Univ. of N.Y., 555 F. Supp. 2d 381, 401

(S.D.N.Y. 2008) (same re the NYCHRL).

        As to any other unidentified jobs, it clearly would be impossible for the City

to investigate Kastner's claims without further information.  Additionally, he has not

alleged that other individuals who were younger or lacked German surnames did get these

jobs.  Taken together, there simply is insufficient factual material to render plausible

---

[13]        Kastner also has identified two Metropolitan Transportation Authority ("MTA")
jobs for which he passed a test.  (See Am. Compl. at 136) ("Conductor" and "Structure
Maintainer Group G" jobs.).  His claims against the MTA and the other non-moving defendants
are addressed in Section G below.

Kastner's claims that the City discriminated against him by declining to employ him on the basis of his German name or his age.

2.     Style

Kastner cannot bring a claim under Title VII against Style because he has not alleged that he filed an EEOC complaint.  It is unclear whether he can allege discrimination under the NYSHRL or the NYCHRL against Style because, as noted above, the statute of limitations under both statutes is three years, and Kastner nowhere details when he worked for Style.[14]  See N.Y. C.P.L.R. § 214(2); N.Y. City Admin. Code § 8-502(d).  To the extent that Kastner seeks to recover damages against Style based on a hostile work environment pursuant to Section 1981, his claim is subject to a four-year statute of limitations, and thus is more likely to be timely.  See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83 (2004) (holding that four-year statute of limitation applies to hostile work place claims under Section 1981).  Nevertheless, even if Kastner's claims of a hostile workplace under Section 1981, the NYSHRL, or the NYCHRL are timely, they fail to state a plausible claim.

A plaintiff seeking to establish the existence of a hostile work place must show that it was "permeated with instances of . . . discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult'" which are so severe that "'the

_____

[14]     During the November 5 conference, Kastner indicated that he worked for Style, then Mystic, and then returned to Style.  He apparently returned to Style for approximately three and one-half years after an accident in late 2001.  It is unclear, however, when that second stint at Style began.  (See Nov. 5, 2009 Tr. at 13-14).

environment would reasonably be perceived, and is perceived, as hostile or abusive.'"
See Williams v. County of Weschester, 171 F.3d 98, 100 (2d Cir. 1999) (quoting Harris v.
Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  In determining whether a case rises to this
level, courts consider the totality of the circumstances, including the "frequency of the
discriminatory conduct; its severity; whether it is physically threatening or humiliating, or
a mere offensive utterance; and whether it unreasonably interferes with the employee's
work performance."  Harris, 510 U.S. at 23.

      Kastner's claims against Style are predicated on the actions of Rosenberg,
Style's CEO.  Kastner alleges that Rosenberg degraded him and used racial epithets.
(Am. Compl. at 12).  Rosenberg also gave Kastner inferior taxis to drive and sent him
home without compensation because of his German name.  (Id. at 12, 125).  Kastner
further contends that Rosenberg's failure to fix the taxi seats shows his hateful intent
towards Kastner.  (Id. at 64).  He also alleges that Rosenberg forced Kastner to run unpaid
errands for him.  (Id. at 12).

      These allegations lack the factual detail required to make Kastner's hostile
workplace claims plausible.  For example, there are no factual details that demonstrate
that Rosenberg's alleged hatred of Kastner is based on Kastner's German heritage.
Additionally, Kastner alleges that Rosenberg used racial epithets, but fails to specify
those alleged racial epithets or their frequency, and has not shown that they were directed

at Kastner.[15]  Finally, and perhaps most importantly, in his Amended Complaint, Kastner alleges that <u>all</u> of the numerous defendants in this action (many of whom are unrelated) invidiously discriminate against people with German surnames.  This blanket, and wholly unsupported, allegation renders all of Kastner's allegations concerning anti-German bias on the part of Rosenberg and Style implausible.  <u>See</u> <u>Denton v. Hernandez</u>, 504 U.S. 25, 29 (1992) (upholding magistrate judge's finding that while the complaints taken separately are not necessarily frivolous, taken together the facts alleged appear to be "wholly fanciful").

It follows that Kastner has failed to show that his allegations of a hostile work environment are plausible.

3.     <u>Lopez, Mystic, and Hedi and Gus Kodoglannis</u>

In his Amended Complaint, Kastner alleges that he was "illegally" fired by Mystic in 2002.  (<u>See</u> Am. Compl. at 131).  According to Kastner, he was terminated because "Hedi Kodoglannis flipped that . . . I was late with my leasing payment to Mario Lopez."  (<u>Id.</u> at 131).  If so, this clearly is a nondiscriminatory reason for firing Kastner.  Moreover, Kastner nowhere alleges any reason why this basis for his firing would be illegal.

---

[15]     Indeed, Kastner claims that Rosenberg delivered the epithets over Style's public address system.  (<u>See</u> Am. Compl. at 12).  If so, it is far from clear that they were directed at Kastner.  Kastner also alleges that Rosenberg discriminated against both Arabs and those with German names, (<u>see</u> <u>id.</u> at 63, 125), suggesting that the epithets may not have been directed specifically at employees whose ancestry was German.  (<u>Id.</u>).

E.     RICO and Conspiracy Claims

Kastner has peppered his Amended Complaint with the word "racketeering."  (Am. Compl. at 14, 47, 99, 120, 123, 133-34).  Liberally construed, the Amended Complaint thus alleges a claim under the Racketeer Influenced and Corrupt Organizations statute ("RICO"), 18 U.S.C. §§ 1961-1968.  He apparently alleges that the racketeering scheme is based on Hereford's sale of cut-rate workers' compensation insurance policies to taxi drivers' employers.  (See Am. Compl. at 120-21).  Kastner alleges that Hereford refuses to honor claims made under those policies and, in fact, arrests drivers who file workers' compensation claims, contending that they have committed insurance fraud.  (Id.).  Moreover, because many taxi drivers cannot speak English well, Hereford allegedly coerces them into accepting a plea arrangement after they are charged with insurance fraud.  (Id.).  Kastner alleges that Mystic and Lopez conspired with Hereford in furtherance of this scheme.  As he explains "Federal Conspiracy arises when two or more Insurance companies and or defendants talk, sign documents, and agree to prosecute claimant through either a district attorney, court judge, and or state insurance fraud representative and bias someone, illegally[.]"  (Id. at 122) (block capitalization omitted).

Section 1962 of RICO outlaws four distinct activities:  "[1] the use of income derived from a 'pattern of racketeering activity' to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce; [2] the acquisition or

maintenance of any interest in an enterprise 'through' a pattern of racketeering activity;

[3] conducting or participating in the conduct of an enterprise through a pattern of

racketeering activity;  and [4] conspiring to violate any of these provisions." Sedima,

S.P.R.L. v. Imrex Co., 473 U.S. 479, 482-83 (1985).  Although each of these activities is

somewhat different, they share the requirement that a plaintiff plead a "pattern of

racketeering activity."  See 18 U.S.C. § 1962(a)-(d).  "Under RICO, a pattern of

racketeering activity consists of at least two acts of racketeering activity (often referred to

as the 'predicate acts') within a ten year period." Conte v. Newsday, Inc., __ F. Supp. 2d

__, 2010 WL 1257887, at *3 (E.D.N.Y. Mar. 25, 2010) (citation omitted).  The possible

predicate acts are listed in 18 U.S.C. § 1961.  A plaintiff also must show that the pattern

of racketeering activity resulted in an injury to the business or property of the plaintiff.

18 U.S.C. § 1964(c); Sedima, 473 U.S. at 496.

Kastner has not sufficiently alleged at least two predicate acts in his

Amended Complaint.  Insurance fraud is not a predicate act under 18 U.S.C. § 1961.

Moreover, although Kastner uses the word "mail" once in his description of the scheme,

(see Am. Compl. at 122) ("Communicated through illegally; by mail as mentioned

aforesaid."), this is insufficient to allege the predicate act of mail fraud.  See Fuji Photo

Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 310-11 (S.D.N.Y. 2009) (mail fraud

need not be pled with particularity if it is alleged only to be in furtherance of another

fraud, but still must be "sufficiently pled to give notice to the defendants").  Kastner also

alleges that certain defendants engaged in "witness tampering" with respect to doctors who were to testify on his behalf at the workers' compensation hearing.  (Am. Compl. at 11).  His allegation of witness tampering, however, is wholly conclusory.  Moreover, even if it would qualify as a predicate act under 18 U.S.C. § 1961, the one instance Kastner alleges is insufficient to show a pattern of racketeering.  Kastner's RICO claim consequently should be dismissed.

      F.     Additional State Law Claims

      Liberally construed, Kastner's Amended Complaint also asserts state law claims for defamation, intentional infliction of emotional distress, breach of contract, fraud, and products liability.  Because this Court has jurisdiction over Kastner's federal claims pursuant to its federal question jurisdiction, it also may exercise supplemental jurisdiction over these state law claims.

      1.     Defamation Claims

      Under New York law, the elements of a cause of action for slander or libel are:  "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege."  Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001).  Furthermore, in an action for slander or libel, the plaintiff must plead the particular words about which he complains.  See Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 763

(2d Cir. 1990) (dismissing case for failure to allege the actual words spoken).  The failure to make any reference to "any allegedly defamatory statements fails to comport with even the liberal pleading requirements of Federal Rule of Civil Procedure 8."  Daniels v. Alvarado, No. 03 Civ. 5832 (JBW), 2004 WL 502561, at *7 (E.D.N.Y. Mar. 12, 2004).

Kastner claims that all of the defendants defamed him, but, with one possible exception, fails to set forth what any of the Moving Defendants are alleged to have said or written.  The exception relates to Kastner's allegation that certain defendants have defamed him with his criminal history.  (See, e.g., Am. Compl. at 145).  Since Kastner admits that he does, in fact, have a criminal history, this assertion is insufficient to make out a defamation claim.  Moreover, it seems apparent that such a claim would be barred by the one-year limitations period for claims of defamation.  See N.Y. C.P.L.R. § 215(3).

Accordingly, because Kastner has failed to plead a plausible, non-time-barred instance of defamation, all of his defamation claims against the Moving Defendants must be dismissed.

### 2    Breach of Contract

Kastner also seeks to bring a claim for "bre[a]ch of contract implied or not implied" against all forty-one defendants.  (See Am. Compl. at 44).  To establish a prima facie breach of contract claim, Kastner first must allege the existence of a contract.  He has done so only with respect to defendants Hereford, Allstate, Continental, and the City.

37

Kastner alleges that Hereford breached its contract with him by not paying his workers' compensation claim.  (See Am. Compl. at 99) ("Hereford bre[a]ched Joseph Kastner's Workers compensation insurance policy.").  However, as noted in Hereford's memorandum of law, and as Kastner himself concedes, he filed a workers' compensation claim which was denied.  (See Hereford Mem. of Law (Docket No. 10), Ex. D; Am. Compl. at 93).  Under New York law, Kastner's exclusive remedy following the denial of his claim was to appeal that ruling.  See Burlew v. Am. Mut. Ins. Co., 63 N.Y.2d 412, 417 (N.Y. 1984) (worker's compensation system is the exclusive remedy for all claims arising out of workplace injuries, whether against an employer or an insurer); see also N.Y. Workers Compensation Law § 29(6) (exclusive remedy provision).  Here, it appears that Kastner failed to file an appeal.  Accordingly, since his breach of contract claim against Hereford is based solely on his workers' compensation claim, it is barred under New York law and must be dismissed.[16]

Kastner's breach of contract claim against Allstate is based on its alleged failure to honor his claim under on an insurance policy following the 1986 robbery.  As noted above, this claim is time-barred.  See N.Y. C.P.L.R. § 213(2).

---

[16]    Indeed, Burlew holds that any action against the insurer arising out of a workplace injury except for an intentional tort claim is barred by the exclusive remedy provision.  Burlew, 472 N.E.2d 682 at 417.  Thus, any claims against Hereford based on its alleged negligence in processing his claim also must be dismissed.  Any intentional tort claims against Hereford based on its rejection of his claim are subject to a one-year statute of limitations and thus are time-barred.  See N.Y. C.P.L.R. § 215(3).

Kastner claims that Continental breached the terms of its accident policy by not paying him $250,000 after he was injured in 2001 during a robbery.  (Am. Compl. at 62).  Kastner's conclusory statement that Continental breached its contractual commitments by not honoring his claim is insufficient as a matter of law.  Kastner did not plead, for example, that he actually filed a claim with Continental (rather than Hereford), nor has he alleged when that claim was denied.[17]  Accordingly, Kastner has not provided sufficient factual detail to make his claim against Continental plausible.

Finally, Kastner claims the City breached certain implied contracts by not hiring him after he passed employment tests because a "[t]est is a contract."  (Am. Compl. at 91).  A test, however, is not a contract.  Cf. Harden v. Maybelline Sales Corp., 230 Cal. App. 3d 1550, 1555 (1991) (application for employment is mere solicitation of offer); Heartland Express, Inc. v. Terry, 631 N.W.2d 260, 269 (Iowa 2001) (same).  Since Kastner has not alleged facts sufficient to show that he entered into a contract with the City, his breach of contract claims against the City must be dismissed.

3.    Fraud

Kastner's Amended Complaint is replete with allegations of fraud on the part of the Moving Defendants, among them that (a) "Continental Invented over 80 Counts of lies and intentional frauds"  (Am. Compl. at 9) (block capitalization omitted);

---

[17]    At one point Kastner alleges that he made a workers' compensation claim to Continental, (id. at 119), but this is wholly implausible since he alleges that he had a life and accidental injury policy with Continental, not a workers' compensation policy, and there seems to be no dispute that Hereford was his employers' workers' compensation carrier.

(b) Continental has "written in false words written, false actions, commercially mis-adverti[s]ed, mis-administrated and or perpetrated with intentional Fraudulent intent" (id. at 112); (c) Style "intentionally leased [Kastner] Fraudulent Taxicabs" (id. at 12); (d) Hedi Kodoglannis "sued [Kastner's] wife through illegal Credit Checks through Astoria Federal Savings Bank as a Fraud; to double her money in Brooklyn Small Claims Court" (id. at 59); (e) the City engages in "intentional frauds for federal money for the homeless that pays for the executive attorneys and or officials" (id. at 59) (block capitalization omitted); (f) Ford engages in "intentional product fraud" (id. at 97); and (g)  Hereford "hire[s] persons to defraud and not pay Taxi Driver[]s"  (id. at 121).

Under New York law, the elements of a fraud claim are "[i] a material misrepresentation or omission of fact [ii] made by defendant with knowledge of its falsity [iii] and intent to defraud; [iv] reasonable reliance on the part of the plaintiff; and [v] resulting damage to the plaintiff." Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006).  Moreover, Rule 9(b) of the Federal Rules of Civil Procedure requires that Kastner "adequately specify the statements [he] claims were false or misleading, give particulars as to the respect in which [he] contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  Kastner has neither satisfied the basic elements of a fraud claim under New York law nor provided the detail required by Rule 9(b).  He has instead made only conclusory statements that various

40

defendants have lied to him, defamed him, and defrauded him.  Kastner's claims for fraud

against all the Moving Defendants therefore must be dismissed.[18]

        4.    Emotional Distress

Kastner avers in his Amended Complaint that he is alleging "emotional

distress" against all of the defendants.  (See Am. Compl. at 43 ("EMOTIONAL

DISTRESS DEFENDANTS 1-41")).  Liberally construed, this allegation presumably

amounts to a claim of intentional infliction of emotional distress.

Under New York law, to prevail on an intentional infliction of emotional

distress claim, a plaintiff must prove four elements: (i) extreme and outrageous conduct;

(ii) an intent to cause, or reckless disregard of, a substantial probability of causing severe

emotional distress; (iii) a causal link between the conduct and the injury; and (iv) severe

emotional distress.  Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996);

O'Bradovich v. Village of Tuckahoe, 325 F. Supp. 2d 413, 434-35 (S.D.N.Y. 2004)

(citing Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)); Holwell v. N.Y. Post Co.,

81 N.Y.2d 115, 121 (1993).  This is a difficult showing to make.  Indeed, as the New

York Court of Appeals noted in Holwell, every intentional infliction of emotional distress

---

[18]      Additionally, New York law bars a fraud action when the only fraud alleged relates to a breach of contract.  See, e.g., Simon v. Unum Group, No. 07 Civ. 11426 (SAS), 2008 WL 2477471, at *3 (S.D.N.Y. June 19, 2008).  Therefore, in the absence of any showing that the insurer-defendants' alleged misconduct consisted of something beyond a contract breach, Kastner cannot recover against them on a fraud theory.

claim to have come before that court has failed "because the alleged conduct was not sufficiently outrageous."  Holwell, 81 N.Y.2d at 122.

To prevail on his claim, Kastner must show conduct that was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized [society]." Bender, 78 F.3d at 790-91 (brackets in original) (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983) (quoting Restatement of Torts (Second) § 46 cmt. d (1965)).  Whether conduct rises to the requisite level of venality is a question of law. Thomas v. Bergdorf Goodman, Inc., No. 03 Civ. 3066 (SAS), 2004 WL 2979960, at *7 (S.D.N.Y. Dec. 22, 2004) (citing Holwell, 81 N.Y.2d at 122).  Here, even giving Kastner the benefit of every conceivable doubt, he has not alleged intentional conduct by any of the Moving Defendants sufficiently outrageous to give rise to an intentional infliction of emotional distress claim, no matter how distressed he himself may be.

5.   Battery

Kastner also alleges throughout his Amended Complaint that the defendants have intentionally caused him physical harm, physical distress, and personal injury.  (See, e.g., Am. Compl. at 43).  These allegations can be liberally construed as a claim of battery.  Under New York law, a battery "is an intentional wrongful physical contact with another person without consent."  United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,

994 F.2d 105, 108 (2d Cir. 1993); <u>Wende C. v. United Methodist Church</u>, 4 N.Y.3d 293, 298 (2005).

Kastner has alleged no facts supporting a claim for battery, however.  He has nowhere alleged that any of the named defendants physically touched him, only that they were responsible for the physical pain resulting from either the 2001 robbery or the alleged defects in the taxis he drove.  In the absence of any allegation that any defendant intentionally touched him without his consent, Kastner has not adequately pleaded the tort of battery.  Consequently, to the extent he seeks to recover damages on that his theory, his Amended Complaint must be dismissed.

6.     <u>Negligence</u>

The only allegations of negligence in Kastner's complaint are (a) that Ford's failure to install an alarm system in its taxis resulted in Kastner's 2001 robbery and (b) that Style and Rosenberg were negligent because they required Kastner to drive old or defective taxis.

The first claim, arising out of the alleged 2001 robbery, is clearly barred by the three-year New York statute of limitations for personal injury actions.  <u>See</u> N.Y. C.P.L.R. § 214(5).

Kastner's second contention, that Style and Rosenberg were negligent in their upkeep of the taxis that Kastner drove, runs afoul of the workers' compensation statute, which was his exclusive remedy against his employer.  <u>See</u> N.Y. Workers'

43

Compensation Law § 29(6); Burlew, 63 N.Y.2d at 417.  Moreover, although Kastner

alleges that Style blocked him from filing a worker's compensation claim, (see Am.

Compl. at 13), under New York law an employee is responsible for filing his workers'

compensation claim by mailing the claim form to the appropriate Workers' Compensation

Board District Office.  See N.Y. Workers' Compensation Law § 20(1); see also

Understanding the Claims Process, http://www.wcb.state.ny.us/content/main/onthejob/

HowSystemWorks.jsp (last visited June 21, 2010).

> 7.    Products Liability

Kastner alleges that the air intake valves and seats in certain vehicles

manufactured by Ford were defective.  This appears to be a design claim inasmuch as he

alleges that defects exist on a wide range of Ford vehicles.  (Am. Compl. at 13).

Under New York's strict products liability law, "a manufacturer breaches its

duty to market safe products when it produces and sells a product designed so that the

product was not reasonably safe." Jimenez v. Dreis & Krump Mfg. Co., 736 F.2d 51, 53

(2d Cir. 1984).  "A defectively designed product 'is one which, at the time it leaves the

seller's hands, is in a condition not reasonably contemplated by the ultimate consumer

and is unreasonably dangerous for its intended use; that is one whose utility does not

outweigh the danger inherent in its introduction into the stream of commerce.'"

Scarangella v. Thomas Built Buses, Inc., 93 N.Y.2d 655, 659 (1999) (quoting Voss v.

Black & Decker Mfg. Co., 59 N.Y.2d 102, 107 (1983)).  The plaintiff bears the burden of

establishing that the product, as designed, was not reasonably safe because there was a

substantial likelihood of harm and that it was feasible to design a safer product.  Voss, 59

N.Y.2d at 108.  "Additionally, to establish a prima facie case, the plaintiff is required to

show that the defectively designed product caused his injury and that the defect was the

proximate cause of the injury."  Id. at 109.

Kastner alleges two principal design defects regarding the Ford taxis he

drives for a living.  First, he alleges that the air intake systems in Ford Crown Victorias,

F350s, and E350s are defectively designed because they are located incorrectly "by the

windshield instead of the front of the car where clean air is."  (Id. at 46; see also id. at 13,

18, 101, 114)  "As a result carbon monoxide, . . . brake dust, . . .  leaky brake fluid fumes,

. . . axle grease fumes, . . . leaky power steering fumes, . . . leaky anti freeze fumes, . . .

leaky transmission fumes, leaky oil fumes, . . . windshield wiper fluid fumes, . . . leaky

Freon gasoline fumes the gas tanks return fuel line, freon from air conditioning system

. . . come in t[h]rough the mis placed air intake system known herein as the windshield air

intake system."  (Id. at 114).  This, according to Kastner, leads to carbon monoxide

poisoning and sudden death, (id. at 84), although the problem has not advanced to this

stage for him; rather he allegedly has suffered only lung and breathing problems.  (Id. at

32).

Construing these allegations extremely liberally, Kastner may have stated

the elements of a design defect claim related to the Ford air intakes, assuming that it is, in

fact, possible to locate the intake system somewhere else.  His allegations, however, fall far short of "plausible."  See Iqbal, 129 Sup. Ct. at 1950-51.  Measured against "judicial experience and common sense," see id., it simply is implausible that Ford customers frequently are dying from carbon monoxide poisoning, but only Kastner has noticed the problem.  (See Am. Compl. at 101) ("[T]he automotive industry does not care; and are killing their own customers.").  Accordingly, this claim must be dismissed.

Kastner's second product liability claim is that Crown Victoria taxis are defectively designed  "[b]ecause Ford does not put in a professional driver's seat like the NJ Transit Buses with a shock absorber air ride."  (Id. at 13; see also id at 73).  More specifically, Kastner alleges:

> The Crown Victoria Seats are a Total Disgrace and are only designed for 1 to 2 hour usage per day and are sold to the Taxi Companies for 24 hour usage; in which cause seat failure collapse, causing a dip-belly in the seat and a sinking deep situation when Taxi Drivers' sit in their defective seats; which occur in all 24 Hour Crown Victoria Taxis and or Police Cruisers. Joseph Kastner[']s Doctor can show you an X Ray and or Hudson's MRI: on how bad Joseph[] Kastner's Back is. It curved and damaged causing excessive pain and suffering from their defective seating. Joseph Kastner drives a different Taxi and cannot Correct this seating Issue; since he is forced to Drive a New York City Taxicab and gets a different Taxicab Everyday. This situation is inherent in ALL FORD CROWN VICTORIA TAXICABS, AND POLICE CRUISER'S. This PRODUCT DEFECTS, situations' are inherent in ALL FORD F350, E350... SERIES 24 HOUR TRUCKS AND VANS.

(Am. Compl. at 97-98).

46

Kastner does not allege that the seats in Ford Crown Victorias, E350 vans, and F350 trucks are unacceptable for nonprofessional drivers, but, rather, that the extended use of them by cab drivers leads to their deterioration.  Thus, the issue appears to be one of lack of maintenance, not unlike a failure to replace the shock absorbers or other parts of an automobile when necessary.  Indeed, Kastner admits that "no one wanted to pay and fix these lousy Taxi Seats."  (Am. Compl. at 31).  Any injury that Kastner suffered due to a taxi company's failure to perform adequate maintenance therefore cannot be addressed in this action because a workers' compensation claim is his exclusive remedy.  See N.Y. Workers Compensation Law § 29(6).

Finally, Kastner alleges that Ford vehicles are intentionally defectively designed so that they will break down and require new, expensive parts.  (See Am. Compl. at 72-73).  This does not adequately state a design defect claim as he has not also alleged that this causes the cars to be unsafe.  He also alleges that Ford vehicles are inherently unsafe because of Ford's failure to include an alarm system, which resulted in his 2001 robbery.  (Id. at 13, 114, 127).  This claim is barred by the three year statute of limitations in New York for personal injury actions.  See N.Y. C.P.L.R. § 214(5).

G.     Claims against non-moving defendants

Kastner filed this suit in forma pauperis, as noted earlier.  Section 1915 therefore authorizes this Court to consider, sua sponte, whether his complaint should be dismissed for failure to state a claim.  Accordingly, I now turn to the issue of whether Kastner's claims against the non-moving defendants are legally sufficient.

1.     Federal Claims

i.     Copyright Infringement

Kastner seeks to recover damages for copyright infringement against the four attorneys allegedly involved in the probate of his mother's estate.  (See Am. Compl. at 31).  To sustain a copyright infringement action, the plaintiff must allege:  "([a] ownership of a valid copyright, and ([b]) copying of constituent elements of the work that are original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); see also Goffe v. Winfrey, No. 08 Civ. 8653 (NRB), 2008 WL 4787515, at *1 (S.D.N.Y. Oct. 31, 2008).  Kastner has not alleged that he is the owner of a registered copyright, which is a prerequisite to filing suit.  See 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").  Accordingly, Kastner has failed to plead a valid copyright claim.  See Wagstaff-EL v. Carlton Press Co., 913 F.2d 56, 58 (2d Cir. 1990) (per curiam); Goffe, 2008 WL 478715, at *2.

ii.     Employment Discrimination

Kastner charges the MTA with employment discrimination based on its alleged failure to hire him because of his German surname after he passed the tests for a "Conductor" and "Structure Maintainer Group G" position.  (Am. Compl. at 47).  According to Kastner, the MTA "failed to interview him twice for 2 passing test scores . . . Never giving the Plaintiffs the benefit of the doubt; because of his German name named: Kastner."  (Id. at 137).  He also notes that "Upon Information and belief there is a German Name Hatred Problem at The New York State MTA."  (Id. at 16).

This claim fails under Title VII due to Kastner's failure to file an administrative complaint with the EEOC or the state agency.  Moreover, to the extent that Kastner seeks to bring this claim under Section 1981, the NYSHRL, or the NYCHRL, he has failed to set forth sufficient facts to state a plausible claim.  Among other things, Kastner fails to specify even the year in which he allegedly applied for these jobs.  He also does not allege any facts sufficient to create an inference of discrimination, such as whether these positions remained open or eventually were filled by someone whose ancestry was not German.  See, e.g., Farias, 259 F.3d at 98 (prima facie case requires allegation that position eventually was filled by someone not in protected class or of circumstances otherwise giving rise to an inference of discrimination); Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995).  His employment discrimination claims

against the MTA or the New York City Transit Authority therefore must be dismissed for failure to state a claim.

> 2.    State Law Claims

In addition to the federal claims previously addressed, Kastner's Amended Complaint also asserts numerous state law claims against the non-moving defendants, including defamation, fraud, and breach of contract.

A federal court may exercise supplemental jurisdiction over state law claims when a federal claim vests the court with subject matter jurisdiction and the state and federal claims "derive from a common nucleus of operative fact." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). A federal court also has the discretion to retain a pendent state claim after dismissing a plaintiff's federal claims on the merits prior to trial, but it must consider "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); see also 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ., 484 U.S. at 350 n.7; see also Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y., 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled

that where . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

Kastner has not shown that there is any reason why the Court should depart from the usual rule against exercising supplemental jurisdiction in this case.  It is possible, however, the Court might be able to exercise diversity jurisdiction over the state law claims that remain.[19]  The difficulty is that Kastner has failed to plead a basis for diversity jurisdiction adequately, as he has not set forth any defendant's citizenship.  See Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont, 565 F.3d 56, 64 (2d Cir. 2009) ("[A] plaintiff premising federal jurisdiction on diversity of citizenship is required to include in [his] complaint adequate allegations to show that the district court has subject matter jurisdiction.").  That said, a plaintiff should generally be given leave to amend to include the basis for diversity jurisdiction, if one exists.  See id.  Accordingly, with respect to the remaining state law claims against non-moving defendants, the amended complaint should be dismissed without prejudice.  Additionally, Kastner should be given thirty days to cure this pleading deficiency if he can.

---

[19]     Kastner has not alleged the citizenship of any of the individuals named in his Amended Complaint.  It appears from the Amended Complaint that Kastner lives in New Jersey, although it is not clear where he is domiciled.  None of the corporations he has named appears to be incorporated in New Jersey, although it is possible that one or more of them maintain a principal place of business there.

51

IV.    Conclusion

For the foregoing reasons, I recommend that the Moving Defendants'

motions to dismiss (Docket Nos. 9, 12, 20, 29, 32, 39, 41, 48) be granted in their entirety.

I further recommend that the federal claims against the non-moving defendants be

dismissed sua sponte with prejudice, and the remainder of the Amended Complaint be

dismissed, without prejudice, pursuant to Federal Rule of Civil Procedure 8(a)(1) based

upon Kastner's failure to allege adequately a basis for jurisdiction.

For Kastner to proceed with any state law claims against the non-moving

defendants, he should be required to submit to the Court within thirty days a proposed

third amended complaint no longer than twenty-five pages.  In the third amended

complaint, Kastner should be required to allege adequately the basis of jurisdiction.  This

means that he must allege the state of citizenship of not only himself, but all of the

individual defendants.  Additionally, for each corporate defendant, he must set forth both

its state of incorporation and the state where its principal place of business is located.

Finally, in marked contrast to the existing Amended Complaint, Kastner should be

required to allege his remaining claims against the remaining defendants in the form of a

"short and plain" statement of the facts, including the specific dates when material events

occurred and concise descriptions of the alleged wrongdoing.

IIV.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this

Report and Recommendation, they must, within fourteen days from today, make them in

writing, file them with the clerk of the Court, and send copies to the chambers of the

Honorable George B. Daniels, United States District Judge, and to the chambers of the

undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e),

72(b).  Any requests for an extension of time for filing objections must be directed to

Judge Daniels.  The failure to file timely objections will result in a waiver of those

objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

SO ORDERED.

Dated:      New York, New York
            June 29, 2010

FRANK MAAS
United States Magistrate Judge

Copies to:

Honorable George B. Daniels
United States District Judge

Joseph Kastner [by mail]
30 Nunda Avenue
Jersey City, NJ 07304

All counsel via ECF